**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MARY TOOMEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 12 C 4017 |
| ) | |
| CAR-X ASSOCIATES CORP., ) | Judge Rebecca R. Pallmeyer |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mary Toomey ("Toomey") worked as a technician for Defendant Car-X Associates Corporation ("Car-X") from 2005 until the store she worked at closed in 2012. Plaintiff claims that, though she was one of the longest-tenured and most-productive technicians on staff, Defendant paid her less than her male counterparts and assigned her less-lucrative jobs because of her sex. Toomey seeks to recover under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* ("Title VII") and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA"). Car-X moved for summary judgment on all counts, arguing that Toomey's pay was determined by her credentials rather than the fact that she is female. For the reasons explained below, the court concludes that Defendant is entitled to summary judgment on the bulk of Plaintiffs' claims, but that disputes of fact preclude summary judgment on her claim that she was unfairly denied certain commission payments. Defendants' motion for summary judgment [25] is therefore granted in part and denied in part.

## BACKGROUND

Plaintiff has more than twenty years of experience working as a car mechanic at numerous car repair shops in and around Chicago. (Compl. [1] ¶ 9). Plaintiff first joined Car-X in 2003, working as a technician at its Des Plaines, Illinois location. Toomey voluntarily left Car-X for a competitor in 2004, but returned in 2005, again as a technician, this time at the store located at 7743 South Cicero Avenue in Chicago, Illinois ("Cicero store"). (Def.'s Resp. to Pl.'s Additional

Material Facts [37], hereinafter "Def.'s Resp. to AMF", ¶ 3.) The Des Plaines and Cicero stores are two of approximately 175 Car-X car-repair shops nationwide. (*Id.* ¶ 1.) Some of these shops, including the Cicero store, are owned by Car-X's parent company, Tuffy Associates Corporation, while others are franchises. (*Id.* ¶ 2.) Plaintiff worked at the Cicero store from her hiring in 2005 until it closed due to poor financial performance on September 4, 2012. (Pl.'s Resp. to Def.'s 56.1 [35], hereinafter "Pl.'s 56.1 Resp.," ¶ 19.) During that period, Plaintiff was the only female technician employed by Car-X in the Chicago area. (Def.'s Resp. to AMF ¶ 8.)

I.  **Car-X Employee Categories**

Defendant primarily employs three categories of workers in its stores: managers, assistant managers, and technicians. (Pl.'s 56.1 Resp. ¶¶ 21-26.) Managers run day-to-day operations at Car-X shops, hire and discipline assistant managers and technicians, coordinate schedules for store personnel, and produce estimates for customers. Managers typically do not diagnose or repair problems with vehicles. (*Id.* ¶¶ 21-22.) Assistant managers are first-line supervisors for technicians, observing their repair work and offering assistance as needed. Assistant managers also exercise all managerial duties whenever their managers are not present. (*Id.* ¶¶ 23-24.) Technicians diagnose problems with vehicles and perform related repairs. They do not interact with customers, nor do they participate in the tasks required of managers and their assistants. (*Id.* ¶¶ 25-26.) Some Car-X stores also employed a fourth tier of employees, workers Plaintiff refers to as "oil change technicians" or "lube techs." (Def.'s Resp. to AMF ¶ 10.) These individuals primarily performed oil changes and, unlike so-called "full-service technicians," did not diagnose or repair vehicles. (*Id.* ¶ 12.) They earned minimum wage, did not receive commission, and were often part-time workers. (*Id.* ¶¶ 10-11.) Toomey argues that the Cicero store employed three such technicians who earned between $8.00 to $8.25 per hour and "only performed oil changes": Scott Compton, Kyle Zitzka, and Jacoby Williams. (*Id.* ¶ ¶ 13-14.) Car-X admits that some of its technicians primarily perform oil changes, but denies that the Cicero store employed any such

2

technicians. (*Id.* ¶ 10-13.) Specifically, Defendant argues that Compton, Zitzka, and Williams were eligible to receive commission pay (discussed below), "meaning that they were not hired to perform oil changes exclusively." (*Id.* ¶ 12; Christian Decl. [38] ¶ 9; Pl.'s 56.1 Resp. ¶ 73.)

## II.     Pay Rates at Car-X

Car-X pays its technicians using a "hybrid system" based on both hourly and commission rates of pay. Each technician is paid according to the method of compensation that provides the higher amount of pay for a given weekly pay period. (Pl.'s 56.1 Resp. ¶ 62.) That is, a technician whose hourly rate was $10 would receive $400 for a 40-hour work week, unless he or she had generated commissions of more than $400 during that week; if that happened, the technician would be paid commission only. Technicians did not interact with customers or make sales; instead, their commission pay was based on the jobs assigned to them by their managers. (Def.'s Resp. to AMF ¶ 43.)

### A.     Commission Rates

Prior to April 21, 2008, all technicians received a commission rate of 13%. (Def.'s Resp. to AMF ¶ 23.) On that date, however, Defendant adopted the Car-X Technician Pay Plan ("Pay Plan"), which (1) gave managers the discretion to set technicians' commission rates; and (2) established non-binding guideline commission rates[1] based on technicians' tenure and Automotive

---

[1]     The Pay Plan suggested commission rates as follows:

| Title | Commission Rate | ASE Certifications | Experience |
|---|---|---|---|
| A Tech | 15-16% | 3 | 3+ years |
| B Tech | 14-15% | 1 | 1-3 years |
| C Tech | 13-14% | 0 | 1-3 years |

(Def.'s Resp. to AMF ¶ 29.)

3

Service Excellence[2] ("ASE") certifications.[3] (Pl.'s 56.1 Resp. ¶ 41.) The guidelines were not mandatory, however, and individual store managers were free to assign pay rates outside the Pay Plan ranges. (Def.'s Resp. to AMF ¶ 29; Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. [31], hereinafter "Pl.'s Resp.," at 6.) Though they enjoyed wide discretion, Defendant insists that managers at the Cicero store "consistently and universally paid technicians with ASE certifications more than those without certifications." (Def.'s Resp. to AMF ¶ 29.)

Like all technicians at the time, Toomey started at the Cicero store in 2005 with a commission rate of 13%. (*Id.* ¶ 23.) When Car-X moved to variable commission rates in 2008, Toomey's then-manager, Daniel Cameron, upped Plaintiff's rate to 14.5%. Toomey's commission rate remained at 14.5% until her termination in 2012. (Def.'s Resp. to AMF ¶ 21; Toomey Dep., Ex. A to Parsons Decl. [26], hereinafter "Toomey Dep. (Parsons)," at 185:8-18.) This rate was higher than what the Pay Plan guidelines suggest for someone who, like Plaintiff, has not earned any ASE certifications. (Def.'s Resp. to AMF ¶ 29; Toomey Dep. (Franklin) at 110:10-13.) Under the Pay Plan, Plaintiff qualified as a "C Tech" and had a guideline commission range of 13-14%. (Def.'s Resp. to AMF ¶ 29.) Toomey argues, however, that her commission rate should have been even higher based on her tenure (she was the second-most senior technician of the fifty nine[4] in the Chicago area as of 2012) and her performance (she had the fifth highest sales among Chicago-

---

[2] Though the parties do not explain this, the court understands that ASE certifications are administered by the non-profit National Institute for Automotive Service Excellence ("NIASE"). NIASE offers exams in over forty automotive-related categories, and 330,000 car professionals have one or more ASE certifications. *ASE at a Glance*, NAT'L INST. FOR AUTOMOTIVE SERVICE EXCELLENCE, http://www.ase.com/About-ASE/ASE-at-a-Glance.aspx (last visited Sept. 24, 2013).

[3] Neither party has offered any information regarding the reasons that led Car-X modify its technicians' compensation scheme.

[4] Defendant disputes the number of technicians in the four stores Plaintiff describes as the "Chicago-area" locations. Defendant does not go so far as to offer its own total, but contends that Toomey "omitted many male technicians from her list" of fifty nine. (Def.'s Resp. to AMF ¶ 28.) Regardless, the distinction is immaterial to the court's determination here.

area technicians in 2011, the last full year the Cicero store was in business). (*Id.* ¶¶ 25, 27-28; Pl.'s Resp. at 3.) Among technicians at the Cicero store, Plaintiff was the longest-tenured and second most productive based on the same data. (Def.'s Resp. to AMF ¶¶ 25, 28.) Despite Plaintiff's performance record, seven technicians at the Cicero store received both higher commission rates and higher hourly rates. (*Id.* ¶ 28.)

Defendant explains Plaintiff's relatively low commission rate was for two reasons: First, the Cicero store suffered from "uniquely poor financial performance," which Defendant argues played a role in compensation decisions at the store. (Pl.'s 56.1 Resp. ¶ 14.) (As Plaintiff herself was among the more productive technicians in Chicago, the court presumes the Cicero store's poor performance resulted in spite of, not because of, her efforts.) Second, Plaintiff's pay rate was lower than some of her peers, according to Car-X, due to the fact that she never obtained any ASE certifications. (Def.'s Rep. [36] at 8-9.) Toomey argues that both of these justifications are inconsistent with actual practice for paying technicians. Compared to three other stores near the Cicero location[5], Plaintiff suggests that Cicero's technicians were actually the second-best compensated.[6] (Def.'s Resp. to AMF ¶ 35.) Plaintiff reaches this conclusion by taking the average hourly rate among technicians at each store. (Franklin Decl. ¶ 14.) Car-X disputes Toomey's conclusion, however, arguing that (1) there is no reason to compare, as Plaintiff does, the four

---

[5] Specifically, Plaintiff refers to the following four locations, which she describes as the "Chicago-area stores": South Cicero and South Stony Island in Chicago, Illinois; Gary, Indiana; and North Aurora, Illinois.

[6]

| Store | Average Hourly Technician Rate |
|---|---|
| Stony Island | $11.81/hour |
| Cicero | $11.62/hour |
| Gary | $11.34/hour |
| North Aurora | $13.83/hour |

(Def.'s Resp. to AMF 35.)

"Chicago area" stores; (2) Plaintiff's calculations selectively omitted Lamar Herbert, a well-compensated employee at the South Stony Island store, in order to artificially inflate Cicero's average hourly rate; (3) one of the stores (North Aurora) does not provide a fair comparison as it was, until 2011, a franchise, and the franchisee, not Car-X, set the technicians' wage rates; and (4) Toomey's methodology is otherwise flawed. (Def.'s Resp. to AMF ¶¶ 2, 35.) Car-X suggests that in order to properly compare technicians' compensation, "one must divide total compensation received by technicians . . . by the hours worked by technicians in that store." (*Id.*) By this measure, Cicero's technicians were paid significantly less on average than their peers at nearby stores.[7] As for ASE certifications, Plaintiff points out that several male technicians at other stores who also lacked certifications were nonetheless paid higher hourly rates than Toomey, despite also producing less revenue. (Pl.'s 56.1 Resp. ¶¶ 33, 41.) The parties agree, however, that Plaintiff had the highest pay rates of any technicians without an ASE certification at the Cicero store (Defendant asserts that there were eight such technicians, while Plaintiff argues that only four of the eight performed work comparable to Toomey). (*Id.* ¶ 41.)

Unlike many of her fellow technicians at Car-X, Toomey never attempted to obtain an ASE certification. (Pl.'s 56.1 Resp. ¶¶ 43-44.) Of the eleven[8] Cicero store technicians since 2009, seven

---

[7]

| Store | 2012 Total Technician Camp | 2012 Total Technician Hours | 2012 Average Hourly Technician Comp. |
|---|---|---|---|
| Stony Island | $148,623.29 | 9045.52 | $16.43/hour |
| North Aurora | $ 63,567.21 | 4472.79 | $14.21/hour |
| Gary | $ 61,943.89 | 4435.25 | $13.97/hour |
| Cicero | $ 41,237.21 | 3201.13 | $12.88/hour |

(Def.'s Resp. to AMF 35.)

[8] Defendant contends that there were fifteen technicians during this time period, but Plaintiff argues that four individuals were qualified only to perform oil changes and did not perform
(continued...)

had active or expired ASE certifications.[9] (*Id.* ¶ 68.) Plaintiff testified that she chose not to seek ASE certifications because she could not afford to take the tests, which would require her to take time off work and pay $75 per exam (Def.'s Resp. to AMF ¶ 30); and because she viewed certification as unnecessary because "a test doesn't help you improve your skills." (Toomey Dep. (Franklin) 114:3-4.) Defendant suggests that price should not have been a concern, however, as Car-X reimbursed technicians for the expense of obtaining ASE certification. (Pl.'s 56.1 Resp. ¶ 39.)

As a technician's commission is based on the total sales revenue attributable to that individual, each technician's commission pay depends on the value of the jobs he or she is assigned as well as his or her commission rate. In addition to setting commission rates and hourly rates, the manager of each Car-X store also controlled job or "ticket" assignments, and, therefore, had significant power over how much money each technician earns under the commission pay structure. (Def's Resp. to AMF ¶ 43.) Managers' discretion in this area was somewhat limited, however, by a technician's ability to perform the particular job to be assigned, some of which, such as air conditioning work, require ASE certifications. (*Id.*; Toomey Dep. (Franklin) at 108:1-22.) Technicians nonetheless controlled a portion of their own commission by identifying and fixing additional problems on cars they were assigned to service. (Def.'s Resp. to AMF ¶ 43.) Plaintiff claims that her managers deliberately favored male employees in the assignment and allocation of tickets. (Compl. ¶ 24.) For instance, Plaintiff claims that when a ticket required two technicians to complete the job, management would regularly assign the commission on that job to the male technician, leaving Toomey to complete the same work as her male peer, but without receiving any

---

[8](...continued)
work comparable to Toomey. (Pl.'s 56.1 Resp. ¶ 68.)

[9] The Pay Plan does not differentiate between active and expired ASE certifications. (Pl.'s 56.1 Resp. ¶ 57.)

of the commission. (*Id.* ¶ 28.) Specifically, Toomey alleges that such manipulation occurred on several jobs that Plaintiff worked with fellow technician Tom Stewart[10] that were worth "$7000 each or more." (*Id.* ¶ 29; Def.'s Resp. to AMF ¶ 52.) Defendant argues that these complaints are unfounded, citing the fact that Plaintiff signed each of her time sheets certifying that her commission records were correct. (Def.'s Resp. to AMF ¶¶ 51-52.) The fact that Toomey certified her time sheets as accurate does not, however, rebut her claim of unfairness in commission assignment. It may be that Toomey knew that, when a particular job was assigned, for commission purposes, to her male co-worker, she herself was not eligible for commission on that job regardless of how much work she contributed. Signing time sheets–that is, acknowledging that the math is correct–is not the same thing as agreeing that the assignment was fair.

Even when Toomey was assigned tickets, she claims they were predominantly low-value jobs, such as warranty work which generated no sales value and, therefore, no commission. (Compl. ¶ 25.) Similarly, she testified that she was assigned more than her share of "comebacks" (cars that were not properly repaired by Car-X and require additional work free of charge.) (*Id.* ¶ 27.) Plaintiff concedes she has no evidence, beyond her deposition testimony, as to how many comebacks each technician performed, because comebacks were not consistently or formally documented. (*Id.* ¶¶ 45, 48.) Defendant likewise has no data regarding the frequency with which individual technicians were assigned comeback. To substantiate her claim, Plaintiff points to sales data indicating that she was near the bottom of all technicians in terms of the average value of each ticket assigned to her. (Def.'s Resp. to AMF ¶ 26.) Defendant argues, however, that Plaintiff manipulated this information by "selectively omit[ing] many technicians[11] from her list, almost all of

---

[10] Stewart had eight expired ASE certifications as well as one current certification. (Def.'s Resp. to AMF ¶ 31.)

[11] Specifically, Plaintiff refers to Leonard Banks ($6.84, Leroy Livingston ($24.14), Benny Mohn ($23.23), Damian Shelley ($64.76), and Jacoby Williams ($45.96). (Def.'s Resp. to
(continued...)

whom had a lower sales per repair average" than Toomey in order to reach the conclusion that she received low-value assignments. (*Id.* ¶ 26.) Car-X argues that, in reality, Plaintiff's average sales per repair was above the Cicero store's average at all relevant times, and in 2012 she actually had the highest sales per repair of any technician in the store. (*Id.* ¶ 47.) It is undisputed that Plaintiff had the highest average sales per repair among all non-ASE certified technicians at the Cicero Store. (*Id.* ¶ 26.) Finally, Plaintiff claims that she trained four male technicians, yet continued to earn less than they did. (Compl. ¶¶ 19-20.) One of these technicians, Refugio Lopez, earned more than Plaintiff only after leaving to work at another Car-X store; the other three—Robert Paxton, John Schultz, and Michael Lesak—each had at least one ASE certification. (Def.'s Resp. to AMF ¶ 53.)

### B. Hourly Rates

When first hired at the Cicero store in January 2005, Plaintiff's manager at the time, James Crumbowitz, set Toomey's hourly rate at $9.00 per hour. (Toomey Dep., Ex. R to Franklin Decl. [33], hereinafter "Toomey Dep. (Franklin)," at 242:8-15.) Plaintiff received a single $1.00 raise, to $10.00 per hour, during her seven-year tenure at the Cicero store. (Def.'s Resp. to AMF ¶ 22.) That raise came on January 1, 2007 as the result of a settlement of a sexual harassment claim by Plaintiff against Car-X.[12] On at least two occasions, Toomey requested an hourly rate increase. First, in October 2011, Toomey told her district manager,[13] Todd Armstrong, that she knew she earned less than her male coworkers and that she needed a raise to help pay for her daughter to

---

[11](...continued)
AMF ¶ 26; Christian Decl. ¶ 17.)

[12] Toomey filed this claim with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC") on September 22, 2006, alleging that she was sexually harassed by a coworker, that her manager did nothing when she reported the harassment to him, and that she was retaliated against as a result of her complaint to the manager. (*Id.*; IDHR Claim, Ex. 7 to Pl.'s 56.1 Statement of Additional Facts [34], hereinafter "Pl.'s 56.1"; EEOC Settlement Agreement, Ex. 8 to Pl.'s 56.1.)

[13] District managers supervise store managers. (Pl.'s 56.1 Resp. ¶ 22.)

attend college. (Def.'s Resp. to AMF ¶ 37.) Armstrong asked, "Where is her father?," prompting Plaintiff to leave the room before Armstrong offered a substantive response. (*Id.* ¶ 38.) Toomey asserts that Armstrong's answer reflects a gender stereotype. (*Id.*) A few weeks later, Armstrong and Plaintiff had another conversation regarding her hourly pay rate. This time, Armstrong told Toomey he would give her a $1.00 raise, to $11.00 per hour, "if she got three ASE certifications." (*Id.* ¶ 40.) Plaintiff was also advised by a Car-X trainer on at least fourteen separate occasions during her seven-year tenure at the Cicero store to obtain ASE certifications. (Pl.'s 56.1 Resp. ¶ 44.) But Plaintiff never obtained any ASE certifications, and her hourly rate remained $10.00 per hour until the Cicero store ceased operations in 2012. (*Id.* ¶ 22; 43.)

Similar to her commission rate (discussed above), Plaintiff alleges that her hourly pay rate was lower than that of several male colleagues with lesser credentials because of her sex. (Compl. ¶ 21.) Specifically, she argues that only eight of the 59 Chicago-area technicians had a lower hourly rate than her. (Def.'s Resp. to AMF ¶ 28.) Hourly rates were not governed by the Pay Plan, but Defendant asserts that these rates were also heavily dependent upon ACE certifications, and that is why Toomey's hourly rate remained relatively low. (Def.'s Rep. at 14-15.) Defendant further suggests that Plaintiff has understated her hourly wage relative to her peers by "selectively omitt[ing] many male technicians[14] from her list, all of whom received lower rates of compensation than she did." (Def.'s Resp. to AMF ¶ 28.) Further, just as Plaintiff's commission rate was the highest among Cicero technicians with zero ASE certifications (Pl.'s 56.1 Resp. ¶ 73), Car-X argues that Plaintiff also had the highest hourly rate of pay (*id.* ¶ 68), the highest effective rate of pay (*id.* ¶ 77), and the highest total compensation when compared to her true peers. (*Id.* ¶ 78.)

### III. Working at Multiple Car-X Stores

---

[14] Defendant does not identify by name the male technicians that it argues Plaintiff omitted. Rather, it argues that "Plaintiff has simply removed every employee who received less than $9.00 per hour from the chart." (Def.'s Resp. to AMF ¶ 28.)

Like all Car-X technicians, Toomey was interviewed and hired by the manager of a particular store to work in that store. (Pl.'s 56.1 Resp. ¶ 6.) Plaintiff suggests, however, that, once hired, technicians were actually quite transient, regularly working across multiple Chicago-area Car-X locations. (*Id.* ¶ 12.) Toomey bases this assertion on the fact that she herself worked in five different Car-X stores between 2003 and 2012 (including her previous stint at the Des Plaines shop), and that several other technicians worked at multiple Chicago-area stores from 2010-2012, as well. (*Id.*) Specifically, seven technicians worked in multiple locations in both 2011 and 2012, while three technicians worked in multiple locations in 2010.[15] (Pl.'s 56.1 Resp. ¶ 12.) Car-X acknowledges that technicians occasionally worked at multiple stores, but argues that this interchange was insignificant. For instance, most of the seventeen technicians named by Plaintiff worked less than forty-five hours annually at stores other than their primary location; and five of these individuals worked no more than ten hours or less away from their assigned store in the relevant year.[16] (Def.'s Resp. to AMF ¶ 15-16.) Toomey herself worked just 36.5 hours at Car-X stores other than the Cicero location from 2009-2012, compared to 7199.05 hours at the Cicero shop. (Pl.'s 56.1 Resp. ¶ 13; Toomey Wage History of 2005-2012, Ex. E to Franklin Decl.) Car-X argues that the small number of hours Toomey and others put in at stores other than their own indicates how rare it was for individuals to migrate from store to store. (Def.'s Mem. of L. in Support of its Mot. for Summ. J. [29], hereinafter "Def.'s Mot.", at 11.)

## IV. Administrative Proceedings

---

[15] Plaintiff contends that three technicians worked in multiple stores in 2010, but Defendant argues that one of the three, Hugo Acevedo, was actually an assistant manager. (Def.'s Resp. to AMF ¶¶ 17, 35.) Acevedo worked only 18.06 hours at a store other than his assigned store during 2010. (*Id.*)

[16] Plaintiff does not indicate how many hours each technician worked away from his or her assigned store in a given year. Defendant offers this information only for four technicians in 2012, four more in 2011, and two in 2010. (Def.'s Resp. to AMF ¶¶ 15-17.)

11

On September 12, 2011, Plaintiff filed a charge of discrimination with the EEOC based on these allegations. (Charge of Discrimination, Ex. A to Compl.) Toomey amended her charge on April 5, 2012, adding documentation to support her allegations. (Amended Charge of Discrimination, Ex. B to Compl.) Both charges claimed that Plaintiff was paid less than her male counterparts on account of her sex. On May 14, 2012, the EEOC issued Plaintiff a right-to-sue letter, and she filed the instant suit shortly thereafter. (Notice of Right to Sue, Ex. C to Compl.)

## **DISCUSSION**

### I. Standard of Review

Summary judgment is appropriate where "there is no genuine issue as to any material fact" such that "the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). No genuine issues of material fact exist "when no reasonable jury could find in favor of the non-moving party." *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir.2012). In determining the existence of material facts, the court must examine the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Righi v. SMC Corp.*, 632 F.3d 404, 408 (7th Cir.2011). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. Ill. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Although intent and credibility are often critical issues in employment discrimination cases, no special summary judgment standard applies to such cases. *Majors v. GE Elec. Co.*, 714 F.3d 527 (7th Cir. 2013).

### II. Equal Pay Act Claim

Plaintiff submits that Defendant Car-X discriminated against her by paying her less than her male counterparts in violation of Title VII and the EPA. The EPA, a subsection of the Fair Labor Standards Act ("FLSA"), prohibits sex-based wage discrimination. 29 U.S.C. § 206(d). To establish her prima facie case for a violation of the EPA, Plaintiff must show that: (1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities,

and (3) the work was performed under similar working conditions. *Warren v. Solo Cup Co.*, 516 F.3d 627, 629 (7th Cir. 2008). In determining whether two jobs are equal, the crucial comparison is between positions, not individuals. *Cullen v. Indiana Univ. Bd. of Trs.*, 338 F.3d 681, 698 (7th Cir. 2003) ("Possession of a skill not needed to meet the requirements of the job cannot be considered in making a determination regarding equality of skill") (citing 29 C.F.R. § 1620.15(a)). The EPA does not require proof of discriminatory intent. *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 822 (7th Cir. 2011).

The statute also has a geographic limitation: those employees against whom Plaintiff compares herself must work in the same "establishment." 29 U.S.C. § 206(d)(1). Neither the FLSA nor the EPA provides a definition for this term, but the EEOC has explained that "establishment" had acquired a well-settled meaning by the time Congress enacted the EPA: "[i]t refers to a distinct physical place of business rather than to an entire business or 'enterprise' which may include several separate places of business. Accordingly, each physically separate place of business is ordinarily considered a separate establishment." 29 C.F.R. § 1620.9(a). There are "unusual circumstances," however, where a single establishment may include operations at more than one physical location. 29 C.F.R. § 1620.9(b). The EEOC goes on to identify what might constitute such an exception: "a central administrative unit may hire all employees, set wages, and assign the location of employment; employees may frequently interchange work locations; and daily duties may be virtually identical and performed under similar working conditions." *Id; see Smith v. Allstate Ins. Corp.*, 24 F. Supp. 2d 870, 879 (N.D. Ill. 1998) (finding that multiple offices constituted a single establishment for purposes of the EPA where compensation, job assignments, and promotions were all conducted on a regional basis).

Once a plaintiff has established a prima facie case, the burden shifts to the employer to show that the pay disparity was justified in one of four ways: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other

factor other than sex. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793-794 (7th Cir. Ill. 2007) (citing *Fallon v. Illinois*, 882 F.2d 1206, 1211 (7th Cir. 1989)). The fourth exception is a "broad, 'catch-all' exception and embraces an almost limitless number of factors, so long as they do not involve sex." *Warren*, 516 F.3d at 630 (quoting *Fallon*, 882 F.2d at 1211). Therefore, the provisions of the EPA effectively "establish a rebuttable presumption of sex discrimination such that once an employee has demonstrated that an employer pays members of one sex more than members of the opposite sex, the burden shifts to the employer to offer a gender neutral justification for that wage differential." *Warren*, 516 F.3d at 630 (quoting *Varner v. Ill. State Univ.,* 226 F.3d 927, 932 (7th Cir. 2000)). The justification need not be a "good reason," so long as it is a gender-neutral one. *Wernsing v. Dep't of Human Servs.*, 427 F.3d 466, 468 (7th Cir. 2005). For instance, differences in education and experience may be considered "factors other than sex" under the EPA. *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 697 (7th Cir. Ind. 2006) (citing *Cullen*, 338 F.3d at 702). The justification "must also be bona fide. In other words, an employer cannot use a gender-neutral factor to avoid liability unless the factor is used and applied in good faith; it was not meant to provide a convenient escape from liability." *Warren*, 516 F.3d at 630 (internal quotation marks omitted).

### A. Scope of the Establishment

Plaintiff argues that the proper scope of comparison in this case is across all four Chicago-area Car-X locations, rather than simply the Cicero store.[17] (Pl.'s Response at 10-11.) Toomey suggests that the facts in this case present exactly the kind of "unusual circumstance" that require looking beyond the four walls of a single store. Specifically, Plaintiff points to three factors that she argues make it appropriate to compare her wages not just to Cicero technicians, but to technicians

---

[17] Plaintiff does not explain why her argument leads to the conclusion that technicians at these four stores would be proper comparators. If, as she says, hiring, firing, and compensation are all determined centrally by Car-X, the court's analysis should seemingly apply company-wide.

14

at neighboring Car-X shops, as well: (1) Defendant "employs a central, company-wide policy to set pay rates for technicians"; (2) technicians "frequently worked at different stores in the Chicago area"; and (3) "all full-service technicians perform the same duties" at all stores. (*Id.* at 10.) Defendant, on the other hand, argues that Plaintiff overstates the power exerted by Car-X's "central administrative unit." For instance, while some technicians worked at multiple stores in recent years, such travel was quite rare, and local managers established each store's technicians' rates of pay. Further, Car-X suggests that the "uniquely poor financial circumstances" at the Cicero store make the comparison of wages across locations especially inapt. (Def.'s Mot. at 11-12.)

Plaintiff has not demonstrated the existence of unusual circumstances that overcome the presumption of 28 C.F.R. § 1620.9 in favor of treating a single store as the "establishment" for purposes of wage comparison. The undisputed evidence here shows that the manager of each store hired that location's technicians; that mobility between stores was actually quite minimal; and, while the Pay Plan set company-wide guidelines, even Plaintiff concedes[18] that these guidelines were just that, and store managers were free to assign commission rates outside the guideline range. As the facts of this case do not establish unusual circumstances as defined by 28 C.F.R § 1620.9, only employees from the Cicero store are proper comparators for purposes of Plaintiff's EPA claim.

**B.    Prima Facie Case**

As compared to her fellow Cicero store technicians, it is undisputed that Plaintiff satisfies the three prongs of the prima facie case: (1) she was paid less than male coworkers; (2) for equal

---

[18]    At various points in her response brief, Plaintiff argues that the Pay Plan was a stringent company-wide policy (for purposes of showing that the "establishment" included multiple stores), but also that the Pay Plan was not strictly followed by local store managers who had discretion to award rates outside the Pay Plan guidelines (for purposes of showing that managers were empowered to give Plaintiff a lower rate because of her sex). (Pl.'s Resp. at 6, 10, 12-13.) As the court sees the evidence, the Pay Plan was not determinative in setting technicians' commission or hourly rates.

15

work, that was (3) performed under similar conditions. Specifically, since 2009, seven male technicians in the Cicero store received a higher hourly rate of pay than Toomey (Pl.'s 56.1 Response ¶ 68), and the same seven men also earned a higher commission rate. (*Id.* ¶ 73.) While Defendant argues that Toomey's credentials were inferior to these men (unlike them, she did not hold ASE certifications), the comparison at this juncture is between positions, not individuals; and Defendant acknowledges that Toomey held the same position as the higher-paid male technicians.

## C. Statutory Exceptions

As Toomey has established a prima face case under the EPA, the burden shifts to Car-X to show that the pay disparity was justified by one of the four statutory affirmative defenses. Defendant contends that Toomey's hourly and commission rates are explained by a characteristic that falls under the exception for "factor[s] other than sex": ASE certifications. (Def.'s Mot. at 15.)

Factors other than sex must be gender neutral and bona fide. The policy is undoubtedly gender-neutral. Indeed, the Seventh Circuit has specifically found that differences in education and industry-related experience—such as ASE certification—may be considered a factor other than sex. *Merillat*, 470 F.3d at 697. The preference for ASE-certified technicians is also bona fide. Toomey disputes that the Pay Plan was actually followed by store managers, because "a full one-half [of technicians] were paid outside the guidelines of the policy."[19] But Toomey's argument confuses a rigid, mechanically applied policy with a bona fide one. Although many technicians fall outside the guideline ranges of the Pay Plan (including Plaintiff, who is overpaid according to guidelines), it is undisputed that (1) Plaintiff did not have an ASE certification; (2) every male employee that was paid more than Plaintiff had an ASE certification; and (3) Plaintiff was the highest-paid technician without an ASE certification. There is no evidence in the record to support the notion that Car-X

---

[19] Plaintiff also suggests that Car-X's justification is not bona fide because Car-X did not consistently track years of service. While Defendant disputes the accuracy of this contention, the court notes that years of service are immaterial in that Car-X's "factor other than sex" is ASE certification, not its Pay Plan. Thus, seniority or tenure is not relevant here.

is using ASE certifications as a convenient escape from liability. As Defendant has proven with undisputed evidence that Toomey was paid less than some male counterparts as a result of a gender-neutral factor applied in good faith, Toomey's EPA claim cannot survive summary judgment.

## III. Title VII Claim

Plaintiff also seeks relief under Title VII based on two separate grounds. First, she argues that the bases for her prima facie case under the EPA similarly establish a prima facie case under Title VII.[20] But, as discussed above, Plaintiff has failed to establish an EPA violation, and "a successful affirmative defense to an EPA claim likewise serves as a valid defense to a claim based on Title VII." *Davis v. Chi. Transit Auth.*, No. 01 C 4782, 2003 WL 1193274, at *7 (N.D. Ill. March 13, 2003) (quoting *Fallon*, 882 F.2d at 1213). Thus, the failure of Toomey's EPA claim also dooms this aspect of her Title VII claim.

What remains of Plaintiff's complaint is her allegation that Car-X management assigned her lower-value jobs than her male counterparts. (*Id.*) This aspect of her complaint requires more careful scrutiny. Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee "with respect to [her] compensation, terms, conditions or privileges of employment, because of [her] . . . sex." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, a plaintiff alleging discrimination may proceed under two methods of proof: direct or indirect. *Smiley v. Columbia College*, 714 F.3d 998, 1002 (7th Cir. 2013). Toomey pursues her discrimination claims under the latter.

---

[20] Plaintiff relies on 29 C.F.R. § 1620.27 for the idea that "any violation of the EPA is also a violation of Title VII." (Pl.'s Resp. at 15.) The Seventh Circuit has declined to follow that regulation, however, holding instead that "EPA liability, without more, will not lead automatically to liability under Title VII" because Title VII, unlike the EPA, requires a finding of discriminatory intent. *Fallon v. Illinois*, 882 F.2d 1206, 1208 (7th Cir. 1989); *see also Lang v. Kohl's Food Stores, Inc.*, 217 F3d 919, 922 (7th Cir. 2000) (distinguishing the EPA from Title VII in that the former does not require discriminatory intent).

17

Under the indirect method, Plaintiff may avert summary judgment by first establishing a prima facie case, which requires her to show that (1) she is a member of a protected class; (2) she met United's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably. *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 702 (7th Cir. 2012). The "similarly situated" test requires a comparator to be "comparable to the plaintiff in all *material* respects." *Harper v. C.R. England Inc.*, 687 F.3d 297, 310 (7th Cir. 2012) (emphasis in original) (internal quotation marks omitted). This inquiry takes account of all relevant factors, including whether the employees "(i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (quoting *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003)).

Similar to the EPA context (discussed above), the parties disagree about which Car-X employees may be properly compared to Toomey. The fact that technicians with ASE certifications or technicians from other stores are not proper comparators for purposes of Plaintiff's equal-pay claim may not preclude their consideration with respect to the commission assignment issue; Defendant has not suggested, for example, that management relied on ASE certifications in deciding which mechanic was entitled to a commission. And Plaintiff and the other mechanics did work under the same supervisors. *See Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) ("In the usual case a plaintiff must at least show that comparators . . . dealt with the same supervisor.").

True, the ASE designation might be a basis for different treatment even for mechanics performing the same work. See *Warren,* 516 F.3d at 631 (finding two employees not materially comparable under Title VII due to their different levels of education, though these qualifications

18

were not required by the job description).  Notably, however, Defendant has not directly relied on this distinction in response to Toomey's assertion that Car-X management "assigned her lower-value jobs than comparable male technicians, which depressed her commission pay." (Pl.'s Resp. at 15.)  Instead, Defendant argues that the evidence does not support the assertion that she was in fact treated less favorably. (Def.'s Rep. at 14-15.)  Indeed, in support of this claim, Plaintiff cites to portions of her deposition testimony[21] that are otherwise unsubstantiated by the record. (Pl.'s Resp. at 15. )  For instance, Toomey's 56.1 Statement includes a table that purportedly shows that she was assigned lower-value tickets because her average job value was lower in 2011 than that of male technicians in the Chicago area in 2011. (Def.'s Resp. to AMF ¶ 26.)  While some male technicians did have higher average repairs than Plaintiff that year, the table reveals that Toomey actually had the highest average of any Cicero technician who lacked an ASE certification.  Further, Plaintiff had the highest average sales per repair for the entire Cicero store in 2012. (Def.'s Resp. to AMF ¶ 48.)  But Plaintiff was one of the most productive mechanics at any Car-X store, and her productivity may conceal inequalities in commission or repair assignments.  Thus, though the documentary evidence does not confirm Plaintiff's belief that she was assigned less valuable jobs than her comparators, neither does it defeat that belief.  There are no records concerning numbers of "comebacks," and Defendant has not offered a specific explanation of its practice for assigning commissions in instances in which two mechanics performed a job together.  Thus, the record does not defeat Plaintiff's unfair-job-assignment claim, either.  On this aspect of her case, summary judgment must be denied.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment [25] is granted in part

---

[21] That testimony only refers to two technicians—Armando Contrares and Tom Stewart—both of whom had ASE certifications. (Toomey Dep. (Franklin) at 156:15-21; 174:10-17; Pl.'s 56.1 Resp. ¶ 73.)

and denied in part. Car-X is entitled to judgment as a matter of law on Plaintiff's Equal Pay Claim, and the evidence defeats her claim that she was denied a fair rate of pay in violation of Title VII. Because there are disputes of fact concerning her claim that she was the victim of unequal and unfair commission assignments, however, that aspect of her case survives for trial.

ENTER:

Dated: September 30, 2013

_____
REBECCA R. PALLMEYER
United States District Judge